UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMBAC ASSURANCE CORPORATION and THE SEGREGATED ACCOUNT OF AMBAC ASSURANCE CORPORATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. BANK NATIONAL ASSOCIATION, <br><br> *Defendant*. | No. _____ <br><br> **COMPLAINT** |

Plaintiffs Ambac Assurance Corporation and The Segregated Account of Ambac Assurance Corporation (the "Segregated Account," and together with Ambac Assurance Corporation, "Ambac"), by and through their attorneys Patterson Belknap Webb & Tyler LLP, for their complaint against Defendant U.S. Bank National Association ("U.S. Bank"), Trustee of the Harborview Mortgage Loan Trust 2005-10 ("Harborview 2005-10" or the "Trust"), allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of U.S. Bank's duties as the Trustee of Harborview Mortgage Loan Trust 2005-10, a residential mortgage-backed securities ("RMBS") trust backed by loans originated by Countrywide Home Loans, Inc. ("Countrywide").  Because an event of default, as defined in the governing documents, has occurred, U.S. Bank, as Trustee, is obligated to conduct itself like a prudent person would in managing his or her own affairs, and it owes fiduciary duties to Trust beneficiaries, including Ambac.

2.      In this action, Ambac seeks to prevent U.S. Bank from entering into a settlement that will release the Trust's valuable claims against Countrywide and its successors Bank of America Corp. and Bank of America N.A. (together, "Bank of America") for a fraction of their true value, causing Ambac irreparable injury.  As described in detail in the pages that follow, no prudent person would settle such valuable litigation claims for the amount reflected in the proposed settlement.

3.      Like many RMBS transactions, Harborview 2005-10 has suffered staggering losses since it closed on August 31, 2005.  The reason is now clear:  Countrywide systematically abandoned its underwriting guidelines and critical quality assurance policies in the lead-up to the financial crisis, originating imprudent loans to borrowers without the ability or willingness to repay their debt.  As these borrowers defaulted or became delinquent on their mortgage payments, the cashflows into the securitization became insufficient to make scheduled principal and interest payments to certificateholders, and those certificateholders suffered enormous losses.

4.      Ambac issued a financial guarantee insurance policy (the "Policy") to the Trust for the benefit of certain classes of certificateholders.  Under the Policy, when the Trust suffers a shortfall in payments from the underlying mortgage loans that affects the insured certificateholders, Ambac will step in and make payments to the insured certificateholders.  Ambac's risk of having to make a payment under the Policy, therefore, depends on the creditworthiness of the underlying mortgage loans.  As Harborview 2005-10 has suffered losses, the Segregated Account has paid, incurred and expects to pay nearly $80 million of insurance claims payments.

5.     Ambac and certificateholders, however, are not without recourse against Countrywide and Bank of America.  Under Harborview 2005-10's governing contracts, Countrywide is obligated to repurchase any loan that does not comply with the dozens of representations and warranties it made for the Trust's benefit.

6.     U.S. Bank, as Trustee, is required under the Trust documents to enforce Countrywide's obligations to make the Trust whole.  Moreover, because the Trust has suffered a contractually-defined "Event of Default," U.S. Bank must do more than simply abide by the terms of the contract:  it must exercise the skill and care of a prudent person in maintaining Trust assets, and it undertakes fiduciary duties to Trust beneficiaries.

7.     U.S. Bank enforced Countrywide's obligations by filing suit against Countrywide and Bank of America in New York state court, seeking damages for Countrywide's massive contractual breaches.  In that litigation, U.S. Bank has made sweeping, detailed and damning allegations about Countrywide's mortgage origination practices and the shoddy loans that it originated and that were included in this transaction.  For example, U.S. Bank alleged that Countrywide ignored its mortgage representations in pursuit of profit and market share and that it "purposefully and knowingly: (a) manipulate[ed] the data in the Loan Files in order to facilitate approval of the Loan; (b) blatantly ignor[ed] significant and repeated discrepancies in the Loan Files and Loan applications; [and] (c) fail[ed] to comply with the mandatory checks required by Countrywide's own automated underwriting program."  Fourth Am. Compl. ¶¶ 47-49, 53, *U.S. Bank National Association v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cty), NYSCEF # 371.  U.S. Bank alleged that a review of loans in the Trust "demonstrate[s] Countrywide's large scale failure to abide by its underwriting guidelines in originating the Loans."  *Id.* ¶ 73.

8.      In the litigation, U.S. Bank alleged that Countrywide and Bank of America exhibited a "pattern and practice of refusing to abide by their unambiguous obligation to repurchase Defective Loans." *Id.* ¶ 78.  In connection with expert discovery, U.S. Bank hired an expert in loan reunderwriting to examine a statistically significant random sample of liquidated loans in Harborview 2005-10.  That expert found that ***87% of the loans in the sample*** breached Countrywide's representations and warranties.

9.      U.S. Bank and its litigation counsel have done and continue to do a commendable job in prosecuting the Trust's valuable claims against Countrywide and Bank of America.  The case is now well positioned for the completion of expert discovery and briefing on summary judgment.  Over the course of more than five years of hard-fought litigation, U.S. Bank has spent many millions of dollars in Trust assets prosecuting these claims on behalf of the Trust.

10.     Now, however, U.S. Bank has received a paltry settlement offer from Countrywide and Bank of America that would require the Trust to release all of its claims in exchange for a $56.9 million settlement payment (the "Proposed Trust Settlement").  Acceptance of such an inadequate settlement will harm Ambac by depriving it of the funds that it would receive as reimbursement for past claims if the Trust obtained a judgment or settled its claims against Countrywide for an amount commensurate with their value.

11.     No prudent person or fiduciary would accept such an inadequate settlement.  Applying the 87% breach rate found by U.S. Bank's own expert to the $367 million in collateral losses suffered by the Trust would yield over $320 million in damages.  The proposed settlement consideration of $56.9 million is not even 20% of the damages that the Trust would be entitled to recover based on U.S. Bank's own expert's analysis.  While litigation entails risks and settlements should reflect those risks, no prudent person managing his or her own

4

affairs would settle an RMBS representation and warranty case with an 87% breach rate and a damages claim of more than $320 million for $56.9 million.

12.     Nevertheless, Ambac has very good reason to believe that U.S. Bank will imminently accept this low settlement and forever release the Trust's valuable claims.  U.S. Bank has always been a reluctant plaintiff and only filed this lawsuit against Countrywide and Bank of America at the direction of a certificateholder.  And U.S. Bank is facing billions of dollars of claims in lawsuits filed against it for failing to prosecute similar representation and warranty claims on other RMBS trusts.  Obtaining a positive result in the Harborview 2005-10 litigation would only increase U.S. Bank's exposure in its defensive cases.  Moreover, in its capacity as trustee, U.S. Bank has accepted numerous settlements on behalf of other RMBS trusts.  Indeed, Ambac is not aware of a single instance in which U.S. Bank rejected a proposed settlement offer made to an individual RMBS trust.  In any event, the fact that U.S. Bank accepted other RMBS settlements for similar or lower consideration would not justify or support a decision by U.S. Bank to accept the Proposed Trust Settlement.  For an RMBS transaction in which there has been no event of default (not the case here), the trustee would not be under a prudent person standard and would therefore be entitled to follow a vote or direction from certificateholders to accept a proposed settlement.

13.     While U.S. Bank might be just as happy to accept the Proposed Trust Settlement and be done with prosecuting the case, acceptance of the settlement would be devastating to Ambac and to certificateholders.  The Proposed Trust Settlement would forever release valuable claims against Bank of America and Countrywide, depriving the Trust of its day in court.  And it would do so in exchange for plainly inadequate consideration that no prudent person or fiduciary would accept.

5

14.     The proposed settlement requires U.S. Bank to accept the offer by March 5, 2017.  As of the filing of this complaint, counsel for U.S. Bank refused to confirm to counsel for Ambac whether U.S. Bank intended to accept or reject the settlement.  Ambac files this action seeking declaratory judgment and an injunction to prevent U.S. Bank from accepting the Proposed Trust Settlement in violation of its contractual, statutory, and common law obligations, or, in the alternative, to seek damages to compensate Ambac for the harm caused by the acceptance of the settlement and release of the Trust's claims against Countrywide and Bank of America.

## PARTIES

15.     Defendant U.S. Bank is a national banking association, organized and existing under the laws of the United States, with its principal place of business in Minneapolis, Minnesota, and the main office designated by its Articles of Association in Cincinnati, Ohio.

16.     Plaintiff the Segregated Account is a segregated account that was established on March 24, 2010 pursuant to Wis. Stat. § 611.24, with the approval of the Office of the Commissioner of Insurance of the State of Wisconsin (the "Commissioner").

17.     Upon the Verified Petition of the Commissioner, the Circuit Court for Dane County, Wisconsin, placed the Segregated Account into statutory rehabilitation under Wis. Stat. §§ 645.31 and 645.32 on March 24, 2010.  Pursuant to Wis. Stat. § 611.24(3)(e), the Segregated Account is a separate Wisconsin insurer with the legal capacity and authority to sue in its own name and right.  Ambac Assurance Corporation allocated the Policy and claims at issue in this action to the Segregated Account pursuant to the Plan of Operation for the Segregated Account attached to the Commissioner's Verified Petition (the "Plan of Operation").

9473908

18.     The Commissioner is the court-appointed Rehabilitator of the Segregated Account.  As Rehabilitator, the Commissioner has the authority to prosecute the claims in this action on behalf of the Segregated Account.

19.     Plaintiff Ambac Assurance Corporation is a Wisconsin-domiciled stock insurance corporation authorized to transact surety and financial guaranty insurance.  Ambac Assurance Corporation maintains its principal place of business in New York, New York.  Under the Plan of Operation, Ambac Assurance Corporation performs specified management services for the Segregated Account and retains the right to receive any cash recoveries relating to the policies and claims that were allocated to the Segregated Account, including the Policy and claims at issue in this action.

**JURISDICTION AND VENUE**

20.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims asserted occurred in this District.

22.     This Court has personal jurisdiction over U.S. Bank because U.S. Bank has offices and regularly transacts or transacted business within the state, and it engaged in purposeful conduct within the state by signing a contract that created a New York common law trust, governed by New York law, and by assuming the duties as Trustee of that New York trust.  Further, the facts giving rise to this case arise in part from U.S. Bank's prosecution of a suit in a New York Supreme Court.

9473908

## FACTUAL ALLEGATIONS

**I.    The Harborview 2005-10 Trust**

23.    This action concerns Harborview 2005-10, an RMBS trust originally backed by 4,484 first lien mortgage loans originated by Countrywide with an aggregate principal balance of approximately $1.75 billion.  RMBS certificates, including, on information and belief Harborview 2005-10 certificates, regularly trade in New York and many certificateholders reside in New York.  U.S. Bank is the Trustee of the Harborview 2005-10 Trust.  Ambac issued the Policy covering the Class 1-A1B and Class 2-A1C1 certificates.

24.    Like all RMBS transactions, Harborview 2005-10 aggregates a pool of mortgage loans and issues securities backed by the cashflows from those mortgage loans to investors, known as certificateholders.  By purchasing certificates issued by the Trust, certificateholders acquire rights to the cash flow generated by the payments made by borrowers of the mortgage loans.  Certificates are divided into classes or tranches, with each class of certificates entitled to a different payment priority.  To decrease the risk to certificateholders of a shortfall of mortgage payments to the trust, and therefore to make the certificates more marketable, some RMBS securitizations include a financial guaranty insurance policy.  Under such a policy, the certificate insurer agrees, in exchange for a premium, to make specified payments of principal and interest to insured certificates in the event the cash flows from the underlying mortgage loans are insufficient.

25.    The credit quality and characteristics of the mortgage loans backing the Harborview 2005-10 Trust are therefore of the utmost importance to certificateholders and to Ambac as Certificate Insurer.  The quality of the mortgage loans depends on, among other factors, how the loans were originated, the underwriting guidelines used to approve the loans, the originator's compliance with those underwriting guidelines, the quality and value of the

8

mortgaged property, and compliance with applicable laws.  To assure the Trustee, Ambac and investors of the quality and characteristics of the mortgage loans deposited in the securitization, Countrywide made dozens of representations and warranties about the mortgage loans, which U.S. Bank as Trustee is responsible for enforcing.

26.     The Harborview 2005-10 Trust is governed by a series of interrelated contracts.  First, Countrywide, as seller and servicer, sold and assigned its interest in the mortgage loans to Greenwich Capital Financial Products, Inc. ("GCFP") pursuant to a Master Mortgage Loan Purchase and Servicing Agreement ("MMLPSA"), dated April 1, 2003, as amended on November 1, 2004.[1]

27.     In section 7.02 of the MMLPSA, Countrywide made numerous representations and warranties about the loans being assigned (the "Loan-Level Warranties"), including that

- each loan was underwritten generally in accordance with Countrywide's underwriting guidelines in effect at the time of origination;

- no fraud was committed by Countrywide in the origination of the loans and, to the best of Countrywide's knowledge, no fraud was committed by the borrower or any other person involved in the loan's origination;

- the origination practices used by Countrywide "have been in all respects legal, proper, prudent and customary" and Countrywide "ha[d] no knowledge of any circumstances [] or condition" with respect to the loans "that can reasonably be expected to cause the Mortgage Loan to become delinquent"; and

- the information contained in the Mortgage Loan Schedule was "complete, true and correct."

28.     In section 7.01 of the MMLPSA, Countrywide made additional representations and warranties, including that "[n]o written statement, report or other document

---

[1] The PSA refers to the MMLPSA as the Servicing Agreement or the Purchase Agreement.

prepared and furnished or to be prepared and furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained therein not misleading."  MMLPSA § 7.01(ix) (the "No Untrue Statement Warranty").

29.     The MMLPSA also sets forth the remedies for Countrywide's breach of any of its representations and warranties.  If Countrywide discovers or is given notice of a breach of a Loan-Level Warranty that materially and adversely affects the value of the related mortgage loan, and such breach cannot be corrected or cured within 90 days, Countrywide must repurchase the loan at the Repurchase Price specified in the MMLPSA.  MMLPSA § 7.03.  If a breach involves any representation and warranty set forth in section 7.01 of the MMLPSA, including the No Untrue Statement Warranty, "all of the Mortgage Loans shall, at the Purchaser's option, be repurchased by [Countrywide] at the Repurchase Price."  *Id.*

30.     To effectuate the Harborview 2005-10 transaction, GCFP conveyed a pool of loans acquired under the MMLPSA to Greenwich Capital Acceptance, Inc. (the "Depositor") through a Mortgage Loan Purchase Agreement ("MLPA") dated as of August 1, 2005.  The Depositor then conveyed the loans to the Trust through a Pooling Agreement ("PSA") dated as of August 1, 2005 between the Depositor, GCFP and U.S. Bank.  The PSA is governed by New York law.  PSA § 12.04.

31.     Countrywide's representations and warranties, including the No Untrue Statement Warranty and the Loan-Level Warranties, as well as the right to enforce remedies for breach, were assigned to the Trustee for the benefit of the Trust through the MLPA and the PSA. MLPA § 2.01; PSA § 2.01(a).  Countrywide also restated its representations and warranties contained in the MMLPSA for the benefit of the Trust in a Reconstituted Servicing Agreement

10

("RSA") dated as of August 1, 2005.  Also in the RSA, Countrywide acknowledged the assignment to U.S. Bank of the right under the MMLPSA to enforce Countrywide's obligations, including its obligation to cure or repurchase noncompliant loans.  The RSA is governed by New York law.  RSA at 5.

32.     Ambac agreed to issue an irrevocable financial guaranty insurance policy to Class 1-A1B and Class 2-A1C1 certificateholders pursuant to a Commitment Letter between Ambac and Greenwich Capital Markets, Inc. dated August 31, 2005.  The Policy was issued concurrently with the closing of the transaction.

33.     As Certificate Insurer, Ambac is an express third-party beneficiary of the PSA.  PSA § 12.10.  In addition, the PSA and the Policy issued by Ambac provide that Ambac is subrogated to the rights of the insured certificateholders and has the right to exercise all rights of the holders of insured certificates under the PSA.  PSA §§ 4.05(d), 12.03.

34.     The contracts establishing the Harborview 2005-10 Trust thus establish the basic risk allocation with respect to the Trust.  To the extent Countrywide sold defective loans for inclusion in the Trust, neither Ambac nor certificateholders bear any increased risk from those loans remaining in the Trust; that risk remains with Countrywide.  Countrywide's representations and warranties, and its corresponding promise to cure or repurchase breaching loans, were material to the Trust's formation and material to assessing the risk associated with the mortgage loans backing the certificates.

## II.     U.S. Bank's Obligations as Trustee of Harborview 2005-10

35.     U.S. Bank's obligations and duties as Trustee of the Harborview 2005-10 Trust are established under the PSA, New York common law, and the New York Streit Act.  In exchange for promising to fulfill these duties, U.S. Bank is compensated under the PSA by

receiving a monthly fee calculated as a percentage of the outstanding principal balance of the mortgage loans.  *See* PSA § 8.05.

36.     First and foremost, U.S. Bank has an obligation to acquire and protect the Trust Fund for the benefit of all certificateholders.  *See* PSA §§ 2.01(a), 2.02.  U.S. Bank declared that it "holds or will hold all other assets included in the definition of 'Trust Fund' in trust for the exclusive use and benefit of all present and future Certificateholders."  PSA § 2.02.  The assets in the Trust Fund include the mortgage loans as well as all of the rights conveyed to the Depositor under the MLPA, including the right to enforce Countrywide's repurchase obligations.  PSA § 1.01.

37.     Pursuant to the PSA, U.S. Bank has the authority and the obligation to enforce Countrywide's obligation to cure or repurchase loans that breach Countrywide's Loan-Level Warranties, and to repurchase all of the mortgage loans if Countrywide has breached the No Untrue Statement Warranty.  Section 2.03(a) of the PSA provides that

> Upon its discovery or receipt of written notice . . . of the breach by [Countrywide] of any representation, warranty or covenant under the [MMLPSA] in respect of any Mortgage Loan which materially adversely affects the value of that Mortgage Loan or the interest therein of the Certificateholders, the Trustee shall promptly notify [Countrywide] of such defect, missing document or breach . . . and if [Countrywide] does not deliver such missing document or cure such defect or breach in all material respects during such period, ***the Trustee shall enforce [Countrywide's] obligation under the [MMLPSA] and cause [Countrywide] to repurchase that Mortgage Loan from the Trust Fund*** at the Repurchase Price (as defined in the Purchase Agreement) on or prior to the Determination Date following the expiration of such 90 day period.

(Emphasis added.)

38.     Moreover, U.S. Bank was aware that Countrywide's representations and warranties—and U.S. Bank's promise to enforce those representations and warranties—were fundamental elements of the transaction.  Indeed, rights to enforce Countrywide's repurchase

obligations are expressly defined by the PSA to be part of the Trust Fund that U.S. Bank must maintain for the benefit of the Trust, the Certificateholders and Ambac.

39.    At all times, U.S. Bank owes a duty to Trust beneficiaries to carry out its duties under the PSA, including its duty to enforce Countrywide's obligations, with due care.

40.    Upon the occurrence of an Event of Default, however, U.S. Bank assumes heightened duties as a prudent person and a fiduciary.

41.    *First*, under the PSA, after an Event of Default has occurred, U.S. Bank must "exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  PSA § 8.01.

42.    *Second*, under New York common law, U.S. Bank has an obligation to act prudently following an event of default to secure the basic purpose of the Trust, that is, protecting the assets of the Trust and ensuring repayment of obligations due to the Trust. Following an event of default, U.S. Bank also owes a fiduciary duty to the Trust beneficiaries that requires it to act with undivided loyalty, in the best interest of the Trust, and to avoid any action that would prioritize U.S. Bank's interests at the Trust's expense.

43.    *Third*, the Streit Act, N.Y. Real Prop. Law § 124 *et seq.*, also imposes obligations on U.S. Bank as the trustee of a trust holding mortgage investments.  Under the Streit Act, following an event of default, U.S. Bank is required to "exercise such of the rights and powers vested in the trustee by [the trust] instrument, and to use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs."  N.Y. Real Prop. Law § 126(1).

9473908

### III.     The New York State Action Against Countrywide

44.     On August 29, 2011, U.S. Bank, in its capacity as Trustee of Harborview 2005-10, filed suit in New York Supreme Court against Countrywide, Bank of America Financial Corporation, Countrywide Financial Corporation, Bank of America, N.A. and NB Holdings Corporation, commencing *U.S. Bank National Association v. Countrywide Home Loans, Inc.*, No. 652388/2011 (N.Y. Sup. Ct. N.Y. Cty) (the "State Court Action").[2] *See* Compl., NYSCEF # 2.  The Complaint alleged that Countrywide had breached both the No Untrue Statement Warranty and numerous Loan-Level Warranties.  U.S. Bank also alleged that Bank of America[3] were secondarily liable for Countrywide's breaches based on the legal theories of de facto merger and mere continuation.

45.     Beginning in late 2010, a certificateholder instructed U.S. Bank to request loan files from Countrywide and retained a reunderwriting consultant to review a sample of defaulted loans.  Fourth Am. Compl. ¶¶ 60-61; *see* Apr. 23, 2014 Aff. of Elizabeth Chen, NYSCEF # 172.  The reunderwriting review found breaches of Loan-Level Warranties in 520 of the sampled loans.  *Id.* ¶ 63.  After receiving these results, U.S. Bank provided written notice to Countrywide of the breaches, including detailed descriptions of each breach.  *Id.* ¶ 75. Specifically, U.S. Bank gave Countrywide notice of breaching loans and demanded that Countrywide cure the breaches or repurchase the mortgage loans within 90 days of receiving notice as summarized in the following table:

---

[2] The case briefly proceeded in federal court after a notice of removal was filed on September 6, 2011, but was later remanded back to New York state court.  *See* Notice of Removal, NYSCEF # 7; Order re Mot. to Remand, *U.S. Bank Nat'l Ass'n v. Countrywide Home Loans, Inc.*, No. 2:12-CV-01066 (C.D. Cal. Apr. 5, 2012), ECF # 39.

[3] The initial complaint also named NB Holdings Corporation as a defendant, but subsequent amended complaints withdrew claims against that entity.  *See* Stipulation and Order Regarding Fourth Am. Compl. and Successor Liability Allegations ¶ 2 (Sept. 16, 2016), NYSCEF # 369.

| Date | No. of Breaching Loans in U.S. Bank Notice to Countrywide | Expiration of 90-day Cure Period |
|------|------|------|
| May 6, 2011 | 58 | July 31, 2011 |
| May 13, 2011 | 92 | Aug. 10, 2011 |
| May 19, 2011 | 36 | Aug. 17, 2011 |
| May 25, 2011 | 30 | Aug. 23, 2011 |
| June 2, 2011 | 32 | Aug. 31, 2011 |
| June 16, 2011 | 65 | Sept. 14, 2011 |
| Aug. 4, 2011 | 163 | Sept. 14, 2011 |
| Aug. 23, 2011 | 44 | Nov. 17, 2011 |

*Id.* ¶¶ 75-76.

46.    In addition, on June 13, 2016, the Trustee served a breach notice that identified 842 breaching loans (including the loans identified in the 2011 breach notices) and, based on a finding of a breach rate of 87% in a representative sample of liquidated loans, demanded that Countrywide compensate the Trust for 87% of all previously unidentified liquidated loans. *Id.* ¶¶ 17, 81-84.  As of the date of the Fourth Amended Complaint, September 20, 2016, Countrywide had not repurchased the loans identified in U.S. Bank's breach notices. *Id.* ¶ 66.

47.    U.S. Bank also alleged that, independent of receiving breach notices, Countrywide had discovered breaches of Loan-Level Warranties through its origination and review of the securitized loans. *Id.* ¶¶ 50-58.

48.    Through a series of decisions on motions to dismiss and motions to amend the pleadings, the New York Supreme Court issued a number of key rulings in the case.  First, it

15

denied Countrywide's motion to dismiss on the grounds that the complaint failed to state the breach of Loan-Level Warranties with particularity.  May 29, 2013 Decision and Order at 10-11, NYSCEF # 36.  Second, the Court denied the motion to dismiss claims based on Countrywide's independent discovery of breaches, holding that "allegations that Countrywide discovered breaches on its own trigger the repurchase requirement and obviate any requirement that Plaintiff provide notice of any breach."  Nov. 13, 2014 Decision and Order at 6-8, NYSCEF # 269.  With this ruling, the Court permitted U.S. Bank to present proof that Countrywide had discovered breaching loans throughout the Trust, not just in the loans which were specifically identified in breach notices.

49.     In addition, the New York Appellate Division, First Department has now held that an RMBS trustee can pursue claims under a provision analogous to the No Untrue Statement Warranty, and seek repurchase of all the loans in the Trust.  *See Nomura Home Equity Loan, Inc. v. Nomura Credit and Capital*, 133 A.D.3d 96, 107-08 (1st Dep't 2015), *lv. granted*. If that ruling is affirmed by the New York Court of Appeals, U.S. Bank will have the opportunity to seek reinstatement of its claim based on the No Untrue Statement Warranty, which would further strengthen the Trust's claims against Countrywide and Bank of America.

50.     In the State Court Action, U.S. Bank alleged that Bank of America is secondarily liable for Countrywide's repurchase obligations.  The judge presiding over the State Court Action has already issued a favorable ruling in a similar RMBS case brought by Ambac against Countrywide related to a different group of RMBS trusts.  There, the same judge denied Bank of America's motion for summary judgment on successor liability claims and *granted* Ambac's motion for summary judgment on choice of law and the continuity of ownership

element of the de facto merger doctrine.  *See Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, No. 651612/2010 (N.Y. Sup. Ct. N.Y. Cty. Oct. 22, 2015).

51.     Fact discovery is now complete in the State Court Action, and the parties exchanged expert reports on reunderwriting in 2016.  *See* July 13, 2016 Status Conference Order at 6, NYSCEF # 378.  The parties agreed to delay exchanging expert reports on successor liability until the First Department rules on successor liability issues between Bank of America and Countrywide in the case brought by Ambac cited above.  *Id.* at 7.

## IV.     The Event of Default

52.     As described above, U.S. Bank has heightened obligations after the occurrence of an Event of Default.  U.S. Bank, and its Responsible Officers, as defined in the PSA, has had actual knowledge of the occurrence and continuance of an Event of Default since at least August 29, 2011, when the State Court Action was filed.

53.     The Harborview 2005-10 PSA adopts the definition of Event of Default in the MMLPSA.  PSA § 1.01.  Under section 14.01(ii) of the MMLPSA, an Event of Default occurs upon the "failure on the part of [Countrywide] duly to observe or perform in any material respect any other of the covenants or agreements on the part of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide] by the Purchaser or by the Custodian."

54.     Beginning on May 6, 2011, U.S. Bank sent Countrywide a number of written demands to repurchase breaching mortgage loans in accordance with Countrywide's obligations under section 7.02 of the MMLPSA.  The 90-day period afforded Countrywide under the MMLPSA to cure the breach or repurchase the mortgage loans from the Trust has now elapsed on each of U.S. Bank's demands.  Countrywide has therefore failed to "duly to observe

17

or perform in [a] material respect" a "covenant[] or agreement[]" of Countrywide under the MMLPSA.

55.     In its Complaint filed on August 29, 2011, and in subsequently-filed Amended Complaints, U.S. Bank gave Countrywide written notice that it had failed to comply with its obligations under the MMLPSA, and that its noncompliance had continued unremedied for a period of 30 days.

56.     In addition, in its Complaint filed on August 29, 2011, U.S. Bank "provided notice to Countrywide that it was exercising its right pursuant to Section 7.03 of the [MMLPSA] and Section 2.03 of the [PSA] to require Countrywide, within ninety days of receipt, to repurchase all of the Loans in the mortgage pool" based on Countrywide's breach of the No Untrue Statement Warranty.  First Am. Compl. ¶ 65, NYSCEF # 22.  In its First Amended Complaint, filed on October 4, 2012, U.S. Bank gave Countrywide written notice that it had failed to comply with its covenant and agreement under the MMLPSA to repurchase all the mortgage loans in the Trust.

57.     To date, Countrywide has not repurchased all the loans in the Trust, nor has it repurchased the loans identified in U.S. Bank's demand letters.  Accordingly, an Event of Default under the MMLPSA and PSA has existed since at least August 29, 2011, and remains unremedied through today.

58.     U.S. Bank and its Responsible Officers, as defined in the PSA, have actual knowledge of the occurrence and continuance of the Event of Default.  It was U.S. Bank—acting through its Responsible Officers—that sent breach notices to Countrywide.  And, through its litigation counsel supervised by the same Responsible Officers, U.S. Bank has been prosecuting the State Court Action based on its allegations that Countrywide violated its obligations under

the MMLPSA on a massive scale, and refused to remedy those violations when it received a demand from U.S. Bank to do so.

59.     Moreover, on information and belief, an Event of Default likely existed even earlier.  Pursuant to section 2.02 of the PSA, U.S. Bank, or the Custodian acting on its behalf, was required to "review each Mortgage File delivered to it" and to issue an interim and final certification accompanied by a document exception report.  In the final certification, due 180 days after closing, U.S. Bank, or the Custodian on its behalf, certified that (i) for those loans specifically identified on the mortgage loan schedule, there was full and complete loan documentation in accordance with the requirements of the PSA; and (ii) for those loans identified on the document exception report, U.S. Bank had not obtained complete required documentation.

60.     U.S. Bank, or the Custodian acting on its behalf, had a duty to identify in the final certifications and exception reports any mortgage files that were missing documentation required to be delivered under the PSA.  Such documents typically include documents sufficient to prove ownership of the note and mortgage or otherwise protect title. Given the duties to review the mortgage file and identify missing documents in the exception reports, U.S. Bank knew of numerous instances where it did not receive (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; and/or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

61.     An Event of Default therefore occurred shortly after 180 days after the final exception reports were delivered for each of the Trusts because Countrywide failed to cure or repurchase the loans that were identified by U.S. Bank as not having the contractually required documentation.  U.S. Bank had the ability, obligation and duty, to provide notice to Countrywide of such breaches under the PSA and under common law principles of good faith and its extra-contractual duties to exercise due care.  To the extent that U.S. Bank knew of and failed to give Countrywide notice of these breaches, it cannot hide behind this failure to give notice as a justification for the absence of an Event of Default.

## V.     U.S. Bank Receives An Offer to Settle the New York Litigation for a Fraction of the Trust's Losses

62.     On December 16, 2016, U.S. Bank distributed a notice to certificateholders and to Ambac giving notice that on December 7, 2016, it had received a written offer of settlement from Countrywide and Bank of America (the "Proposed Trust Settlement").  A true and correct copy of the December 16, 2016 Notice to Holders ("Holder Notice") is attached as Exhibit 1.  U.S. Bank received the Proposed Trust Settlement from a group of certificateholders referred to as the Initiating Parties.

63.     The Proposed Trust Settlement provided for Bank of America and/or Countrywide to make a one-time payment to the Trust of $56.9 million, which the Initiating Parties represented to be equal to 15% of the estimated lifetime losses of the Countrywide loans in the Trust.  (As of January 19, 2017, the most recent Trust remittance report, the Trust has suffered cumulative realized losses of $367 million.)  This calculation does not take into account the millions of dollars in legal fees and expenses the Trust has incurred in prosecuting the litigation.  In exchange for this payment, U.S. Bank, on behalf of all Trust beneficiaries,

20

including certificateholders and Ambac, would be required to release all claims arising out of the mortgage loans against Countrywide and Bank of America, and to dismiss the State Court Action with prejudice.

64.     In addition to the payment to the Trust, the Proposed Trust Settlement provides that if the Trustee accepts, the Initiating Parties will receive a payment of over $1.5 million representing attorneys' fees and out-of-pocket costs.  The Proposed Trust Settlement does not contain *any* provision reimbursing the Trust for the attorneys' fees and costs incurred in pursuing the State Court Action, even though those costs have been borne by the Trust (at the expense of Ambac and other Trust beneficiaries) for years.

65.     The Proposed Trust Settlement was not an agreement U.S. Bank had negotiated itself, taking into account the heightened duties it owed to the Trust and its obligation to protect the Trust assets for the benefits of all certificateholders.  Instead, the Proposed Trust Settlement was negotiated and provided to U.S. Bank by counsel to the Initiating Parties, a group consisting of the National Credit Union Administration, the Bank of New York Mellon, solely in its capacity as indenture trustee for the NCUA Guaranteed Notes Trust 2010-R3, Athene Annuity & Life Assurance Company and Athene Annuity & Life Assurance Company of New York. Prior to receiving the settlement agreement, U.S. Bank "had not been previously advised of the negotiations leading up to" the Proposed Trust Settlement and had no knowledge of "the basis on which the Initiating Parties had agreed to its terms."  Holder Notice at 2.

66.     The Proposed Trust Settlement was reached after a mediation between the Initiating Parties, Bank of America, and Countrywide—but, importantly, not U.S. Bank.  As a Trustee exercising the duties of a prudent person and a fiduciary, U.S. Bank has a unique role in evaluating the Trust's claims and any settlement of those claims.  It is the only party that is

charged with protecting the interests of the Trust as a whole, which necessitates a reasoned evaluation of the effect of a settlement on all Trust beneficiaries.  While the Initiating Parties would naturally have an incentive to negotiate a settlement that maximizes recovery to their class of certificates without regard to other classes, U.S. Bank must protect the assets of the Trust as a whole for the benefit of all certificateholders and Ambac, not just the interests of any particular class of certificateholders.

67.     The consideration in the Proposed Trust Settlement is woefully inadequate.  As part of the State Court Action, U.S. Bank retained an expert to reunderwrite a statistically significant random sample of loans in the Trust.  Fourth Am. Compl. ¶ 14.  That expert found a staggering *87%* of all liquidated loans breached Countrywide's representations and warranties.  *Id.* ¶ 16.  This breach rate is consistent with the evidence that Countrywide systemically abandoned its underwriting guidelines as well as principles of prudent underwriting during the period when the Trust loans were originated.  *See id.* ¶¶ 47-49.

68.     In any RMBS representation and warranty litigation, the breach rate serves as the basis for damages and, therefore, is a necessary component in evaluating a settlement offer against the range of likely outcomes in litigation.  No prudent person would agree to a settlement that represents only 15% of lifetime collateral losses after having found a breach rate of 87%.  This is especially true where U.S. Bank's reunderwriting expert found that breach rate after having the opportunity to review the defendants' rebuttal expert report which presumably contested that rate.  All litigation presents some uncertainty, which must be accounted for in evaluating a settlement.  But no reasonable assessment of the uncertainty and cost of litigation could justify a trustee operating as a fiduciary and as a prudent person in accepting a settlement that compensates for only 15% of the Trust's losses under such circumstances.

69. Moreover, in the only RMBS representation and warranty case to proceed to trial and judgment, the plaintiff—an insurer like Ambac—was awarded 100% of its claims payments after the Court credited the plaintiff's findings of pervasive breaches. *See Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013).  In the only other RMBS representation and warranty case to go to trial, involving the MASTR Adjustable Rate Mortgages Trust 2006-OA2, the Court has not yet issued a final judgment, but in a lengthy post-trial opinion issued a number of rulings in the plaintiff's favor. *See U.S. Bank, N.A. v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322, 2016 U.S. Dist. LEXIS 119890 (S.D.N.Y. Sept. 6, 2016). U.S. Bank is aware of these positive outcomes for RMBS cases that proceed to trial; in the MASTR 2006-OA2 case, U.S. Bank itself is prosecuting the suit as trustee.

70. Furthermore, and different from many RMBS claims against now-defunct mortgage companies, there is no risk of U.S. Bank being unable to collect a judgment against Bank of America and Countrywide.  Bank of America has already booked more than $70 billion in expenses related to resolving claims of misconduct in the origination and/or securitization of mortgage loans, most of it arising out of Countrywide's conduct, living up to its CEO Brian Moynihan's pledge to "clean up" for Countrywide's liabilities.  And U.S. Bank has strong claims that Bank of America is legally obligated to pay for any judgment against Countrywide, particularly given that the judge presiding over the State Court Action has already issued favorable rulings on analogous claims.

71. The Initiating Parties may have reason to prefer the Proposed Trust Settlement, including for the attorneys' fee payout that will benefit the Initiating Parties and no one else.  U.S. Bank, too, might have a number of motivations for accepting a plainly inadequate settlement.  From the beginning, U.S. Bank was a reluctant plaintiff in prosecuting RMBS

representation and warranty claims, only acting after being prodded by certificateholders.  In the State Court Action, the certificateholder that initially provided U.S. Bank with direction and indemnity to pursue litigation has since sold its certificates.  Since early 2015, U.S. Bank has been proceeding to prosecute the litigation without any certificateholder indemnifying it against potential claims, a situation that creates risk for U.S. Bank in its personal capacity (though not for the Trust, which benefits from the ongoing litigation and eventual recoveries).  As a defendant in multiple suits alleging that it breached its duties as an RMBS trustee, U.S. Bank faces real risk in continuing the litigation with no backstop protection.  It would be in U.S. Bank's interest to end the State Court Action, even if the resolution were not in the best interest of all certificateholders or of Ambac.

72.     However, under the heightened standards imposed by the PSA, the Streit Act and New York common law following an Event of Default, U.S. Bank can consider none of these interests in evaluating the Proposed Trust Settlement.  Its only concern must be in securing the best interests of the Trust and certificateholders, to whom U.S. Bank owes undivided loyalty and whose interests it must hold above its own.

## VI.     Harm to Ambac

73.     U.S. Bank's acceptance of the Proposed Trust Settlement would directly harm Ambac.  As Certificate Insurer, Ambac Assurance Corporation and the Segregated Account are responsible for making payments to the Trustee for distribution to insured certificateholders when the cashflows from the securitized mortgages are insufficient to make a scheduled principal and interest payment.

74.     Countrywide's systemic breaches of the representations it made about the quality and creditworthiness of loans included in Harborview 2005-10 has resulted in a pool that is vastly riskier than the pool Ambac agreed to insure.  Ambac has incurred significant harm, and

24

continues to incur significant harm, as a consequence of Countrywide's violation of its obligation to repurchase breaching loans.  In the course of its statutory rehabilitation proceedings, the Segregated Account has paid, incurred, and expects to pay nearly $80 million in claims payments on this single RMBS transaction.

75.     If Countrywide had complied with its contractual obligations to repurchase breaching loans by remitting the contractual repurchase price to the Trustee, Ambac would be made whole through the Trust's "waterfall" of payment distributions, either because claims on the Policy would have been avoided or because it would be reimbursed for claim payments under the PSA provision entitling Ambac to be reimbursed for past draws on its Policy if the Trust receives recoveries on the securitized mortgage loans.

76.     Similarly, if Countrywide is ordered by a court to pay damages to the Trustee in an amount equivalent to its repurchase obligations, that sum would be deposited in the Trust and distributed through the waterfall to Ambac and to certificateholders.  If U.S. Bank accepts an appropriate settlement of the Trust's claims, the settlement consideration will likewise go to making Ambac and certificateholders whole.

77.     However, if U.S. Bank accepts an inadequate, unfair, or unreasonable settlement in exchange for releasing the Trust's claims, Ambac will receive less compensation through the waterfall.  Because Ambac must rely on U.S. Bank to protect its rights under the PSA, any action U.S. Bank takes to compromise those claims directly harms Ambac.

78.     Based on numerous settlements that U.S. Bank has accepted in the last several years on behalf of RMBS trusts, Ambac believes that U.S. Bank is highly likely to accept the Proposed Trust Settlement.  On January 19, 2017, when counsel for Ambac asked counsel for U.S. Bank to confirm that it would be rejecting this inadequate settlement, counsel for U.S. Bank

would state only that U.S. Bank was evaluating the settlement, and refused to confirm whether U.S. Bank was going to accept or reject the Proposed Trust Settlement.

79.     The Proposed Trust Settlement sets an acceptance deadline of March 5, 2017.  Ambac therefore reasonably believes that U.S. Bank's acceptance of the Proposed Trust Settlement may be imminent.  As soon as the Proposed Trust Settlement is accepted, the Trust will irrevocably release claims worth hundreds of millions of dollars for grossly inadequate consideration.

80.     Once the Trust's claims are released and the State Court Action dismissed with prejudice, the Trust, and Ambac, will have lost the opportunity to see their claims through the court system or to negotiate a settlement that reflects the true value of the Trusts' claims.  Moreover, there can be no assurance that a recovery of money damages against U.S. Bank after-the-fact will be sufficient to compensate Ambac because U.S. Bank is the subject of scores of lawsuits alleging billions of dollars in damages brought by RMBS certificateholders on other trusts and its ability to satisfy all such claims is uncertain.

81.     Moreover, once the claims at issue in the State Court Action are released, Ambac will be forced to essentially re-litigate those causes of action in order to establish damages against U.S. Bank, but it will be forced to do so in a suit to which Countrywide and Bank of America are not parties.  This "case within a case" poses a substantial additional burden that would significantly prejudice Ambac.  Instead of litigating a case directly against Countrywide and Bank of America, Ambac would have to seek document and deposition discovery from Countrywide and Bank of America as non-parties and would face the uncertainty of having to prove what the recovery would have been in the underlying case if the claims had

not been prematurely released. The dismissal of the State Court Action at this key juncture would cause Ambac irreparable injury.

## VII. The No Action Clause Does Not Apply to This Suit Against U.S. Bank

82. The no action clause in the PSA does not apply to this lawsuit because the claims are brought against U.S. Bank as Trustee, not against a third party. In addition, the claims are brought directly by Ambac against U.S. Bank, not derivatively on behalf of the Trust. Under New York law, compliance with a no action clause is excused in a suit brought by trust beneficiaries against a trustee for its own wrongdoing. Additionally, no action clauses do not apply to claims brought against a trustee for breach of fiduciary duty or other extra-contractual duties.

83. Further, even if demand were required, it would be futile for Ambac to make demand on U.S. Bank as it would be absurd to ask the Trustee to sue itself for its own misconduct.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

84. Ambac realleges and incorporates by reference paragraphs 1 through 84 of this Complaint.

85. The PSA adopts the definition of Event of Default in the MMLPSA, which provides that an Event of Default occurs upon the "failure on the part of [Countrywide] duly to observe or perform in any material respect any other of the covenants or agreements on the part of [Countrywide] set forth in this Agreement which continues unremedied for a period of thirty days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to [Countrywide] by the Purchaser or by the Custodian."

86.     U.S. Bank gave Countrywide notice that numerous loans in Harborview 2005-10 breached Countrywide's representations and warranties made under the MMLPSA, as reconstituted by the RSA, and demanded that Countrywide cure or repurchase those loans within the applicable 90-day period.  Countrywide failed to cure or repurchase the loans identified by U.S. Bank.

87.     Countrywide also independently discovered breaches of its representations and warranties under the MMLPSA, as reconstituted by the RSA, obligating it to cure or repurchase breaching loans with 90 days.  Countrywide failed to do so.

88.     Through its Complaint, filed on August 29, 2011, subsequent Amended Complaints, and its expert reunderwriting report submitted in the State Court Action, U.S. Bank gave Countrywide notice that its breaches of the MMLPSA had been unremedied for 30 days. To date, Countrywide has not remedied its breaches of the MMLPSA.

89.     A real and justiciable controversy exists over whether these events resulted in the occurrence and continuance of an Event of Default as defined by the PSA.

90.     Accordingly, Ambac requests a declaration that (i) an Event of Default occurred under the PSA, (ii) such Event of Default has continued to the present, and (iii) U.S. Bank and its Responsible Officers have actual knowledge of the occurrence and continuance of such Event of Default.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

91.     Ambac realleges and incorporates by reference paragraphs 1 through 90 of this Complaint.

92.     Because an Event of Default has occurred and is continuing, U.S. Bank owes fiduciary duties to the Harborview 2005-10 Trust and its beneficiaries, including Ambac, to

act as a prudent person would in the conduct of such person's own affairs, and to comply with the Streit Act.

93.     Under the PSA, upon an Event of Default and while an Event of Default continues uncured, U.S. Bank must exercise the rights and powers vested in it under the PSA, and shall exercise the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

94.     Under New York law, after the occurrence of an Event of Default, U.S. Bank owed a fiduciary duty to the Trust and to all certificateholders.  This fiduciary duty includes an obligation to exercise all contractually conferred rights and powers in good faith and for the benefit of Ambac and of certificateholders to preserve the assets of the Trust.

95.     Under section 126(1) of the Streit Act, upon an event of default, the trustee must exercise such of the rights and powers vested in the trustee by the trust instrument, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

96.     U.S. Bank has been presented with a Proposed Trust Settlement with an acceptance deadline of March 5, 2017.  As of January 19, 2017, representatives of U.S. Bank refused to confirm whether U.S. Bank would accept or reject the Proposed Trust Settlement.

97.     A real and justiciable controversy exists over U.S. Bank's obligations to the Trust and its beneficiaries in connection with the Proposed Trust Settlement.  Ambac therefore seeks a declaration that U.S. Bank's acceptance of the Proposed Trust Settlement would constitute a breach of U.S. Bank's duties under the PSA, its fiduciary duties, and its obligations under the Streit Act.

### THIRD CAUSE OF ACTION
### (Breach of Contract)

98.     Ambac realleges and incorporates by reference paragraphs 1 through 97 of this Complaint.

99.     The PSA is a valid contract that establishes U.S. Bank's contractual duties and obligations, in its capacity as Trustee, to the Trust, to Ambac, and to certificateholders.

100.    Ambac is an express third-party beneficiary of the PSA in its own right and as subrogee of insured certificateholders.  Ambac is entitled to enforce U.S. Bank's performance as Trustee.

101.    Under the PSA, upon an Event of Default and while an Event of Default continues uncured, U.S. Bank must exercise the rights and powers vested in it under the PSA, and shall exercise the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

102.    An Event of Default occurred at least as early as August 29, 2011, and remains uncured through the present.  U.S. Bank and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

103.    Notwithstanding its heightened duties following an Event of Default, U.S. Bank is contemplating accepting an unreasonably low settlement with Bank of America and Countrywide on the Trust's behalf, releasing the Trust's valuable claims against Bank of America and Countrywide in exchange for grossly inadequate compensation.  No prudent person managing its own affairs would agree to the settlement proposed by Bank of America and Countrywide.

104.    U.S. Bank's material breaches of the PSA in accepting a plainly inadequate settlement will directly and proximately cause damage to the Trust and to Ambac by

depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Policy.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty)

105.     Ambac realleges and incorporates by reference paragraphs 1 through 104 of this Complaint.

106.     Under New York law, after the occurrence of an Event of Default, U.S. Bank owed a fiduciary duty to the Trust and to all certificateholders.  This fiduciary duty includes an obligation to exercise all contractually conferred rights and powers in good faith and for the benefit of Ambac and of certificateholders to preserve the assets of the Trust.

107.     An Event of Default occurred at least as early as August 29, 2011, and remains uncured through the present.  U.S. Bank and its Responsible Officers had and continue to have actual knowledge that an Event of Default occurred and is continuing.

108.     U.S. Bank will breach its fiduciary duty by failing to protect the rights of the Trust, of Ambac, and of certificateholders if it accedes to a settlement that gives inadequate compensation for the Trust's claims.

109.     U.S. Bank's breaches of fiduciary duty in accepting a plainly inadequate settlement will directly and proximately cause damage to the Trust and to Ambac by depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Certificate Insurance Policy.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)

110.     Ambac realleges and incorporates by reference paragraphs 1 through 109 of this Complaint.

111.     As insurer of a New York Trust and subrogee of certificateholders in a New York Trust, Ambac is a Trust beneficiary entitled to the protections under the Streit Act, N.Y. Real Prop. Law § 124 *et seq.*  The purpose of the Streit Act is to provide for the regulation and supervision of trusts concerning real property to ensure that trust assets will be properly conserved and administered.

112.     The Harborview 2005-10 certificates are "mortgage investments," the PSA underlying and establishing the Trust is an "indenture," and U.S. Bank is a "trustee" under the Streit Act.  *See* N.Y. Real Prop. Law § 125(1), (3).

113.     Section 126(1) of the Streit Act requires that upon an event of default, the indenture trustee must exercise such of the rights and powers vested in the trustee by such instrument, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

114.     As set forth above, U.S. Bank will have failed to exercise its rights and powers under the PSA in the manner a prudent person would have done under the circumstances in the conduct of his own affairs if it accepts an inadequate settlement.

115.     U.S. Bank's violation of the Streit Act in accepting a plainly inadequate settlement will directly and proximately cause damage to the Trust and to Ambac by depriving the Trust of valuable claims and remedies, and by squandering hundreds of millions of dollars in Trust assets, which would otherwise benefit Ambac by reimbursing it for past draws on the Certificate Insurance Policy.

9473908

## JURY DEMAND

116.    Ambac demands a trial by jury pursuant to Federal Rule of Civil

Procedure 38 and the Seventh Amendment to the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Ambac respectfully prays for the following relief:

A.      A declaration that (i) an Event of Default occurred under the PSA, (ii) such Event

of Default has continued to the present, and (iii) U.S. Bank and its Responsible

Officers have actual knowledge of the occurrence and continuance of such Event

of Default.

B.      A declaration that U.S. Bank's acceptance of the Proposed Trust Settlement

would constitute a breach of U.S. Bank's duties under the PSA, its fiduciary

duties, and its obligations under the Streit Act.

C.      A preliminary and permanent injunction prohibiting U.S. Bank from accepting the

Proposed Trust Settlement.

D.      In the alternative, an award of all appropriate damages in favor of Ambac and

against U.S. Bank for damages sustained as a result of U.S. Bank's wrongdoing,

in an amount to be determined at trial, including any applicable pre- and post-

judgment interest; and

E.      Any other relief that the Court deems just and proper.

Dated:      New York, New York
              January 20, 2017

PATTERSON BELKNAP WEBB & TYLER LLP

_s/ Peter W. Tomlinson_____
Peter W. Tomlinson
Stephanie Teplin
W. Robert Fair
1133 Avenue of the Americas
New York, New York 10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222
pwtomlinson@pbwt.com
steplin@pbwt.com
rfair@pbwt.com

*Attorneys for Plaintiffs Ambac Assurance
Corporation and the Segregated Account of Ambac
Assurance*

34

9473908